IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARDEST ROSE, III, | ) |
| Plaintiff, | ) No. 17 C 0582 |
| | ) |
| v. | ) Magistrate Judge Michael T. Mason |
| | ) |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Ardest Rose's ("Claimant") applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Claimant's motion for summary judgment (Dkt. 18) is granted and the Commissioner's motion for summary judgment (Dkt. 22) is denied.

I. Background

A. Procedural History

Claimant filed his applications on May 31, 2012, alleging disability beginning on July 21, 2010, due to back issues, stomach bleeding, acid reflux, left foot injury, depression, memory loss, and difficulty sleeping. (R. 285-86, 294-99, 333.) Claimant's applications were denied initially and on reconsideration. (R.111, 118.) On May 21, 2013, Claimant requested a hearing before an ALJ, which began on October 2, 2014,

and was then continued to February 26, 2015. (R. 32-94, 95-105, 169-70.) On July 31, 2015, the ALJ issued a written decision finding that Claimant was not disabled. (R. 11-24.) On December 1, 2016, Claimant's request for review by the Appeals Council was denied, making the ALJ's decision the final decision of the Commissioner. (R. 1-4.) This action followed.

### B. Medical Evidence[1]

Claimant's back, left foot, and shoulder issues stem from a shooting in 2005 when he was shot three times. (R. 446.) The bullets remain lodged in his back. (*Id.*) Claimant also has a history of abdominal pain and symptoms associated with GERD and gastritis. (R. 620, 629, 594.)

On July 5, 2012, Claimant was examined by psychiatrist Mark A. Amdur at the request of his attorney. (R. 446-50.) Claimant reported constant pain in his back and left foot, which limits his ability to sit or stand for very long. (R. 446.) Dr. Amdur noted that Claimant stood three or four times during the interview. (*Id.*) Since the shooting, Claimant is afraid to go outside and fears for the safety of his children. (*Id.*) He complained of worsening depression, occasional crying spells, increased anger, auditory hallucinations, and minimal sleep. (R. 447.) He reported excessive hand washing, up to twenty times per day. (*Id.*)

Claimant sat calmly through the examination and did not exhibit bizarre or inappropriate behavior. (R. 449.) His affect was "prominently depressed." (*Id.*) Dr.

---

[1] The record includes treatment records that pre-date July 21, 2010, Claimant's alleged onset date. (*See e.g.*, R. 496-99, 502-17, 520-24, 527-34, 539-54, 569-80.) Those records reveal repeated complaints of back and foot pain related to his gunshot wounds, as well as symptoms associated with GERD. A consultative examining physician from a previous application noted Claimant walked with a cane and exhibited full range of motion of the cervical and lumbar spine, with complaints of pain. (R. 527-34.)

2

Amdur assessed post-traumatic stress disorder with obsessive-compulsive symptoms and depressed mood, as well as chronic pain. (*Id.*) Dr. Amdur acknowledged that other clinicians might diagnose major depression. (*Id.*) According to Dr. Amdur, Claimaint's "pain preoccupations and intrusive thoughts regarding past trauma would disrupt his ability to maintain his attention on work tasks," and he would be "unable to tolerate work stress." [2] (*Id.*)

On August 21, 2013, Claimant saw Dr. Sashil Kapur. (R. 492.) He complained of pain in his lower, mid, and upper back, which he rated a 7-8 out of 10. (*Id.*) His pain was exacerbated by wet or cold weather, sitting, and certain twisting movements. (*Id.*) He had not taken pain medication for "some time," because it "didn't help" and he "doesn't like taking meds." (*Id.*) Upon examination, Claimant exhibited tenderness and spasms, but full range of motion of the lumbar spine. (R. 493.) Dr. Kapur assessed chronic back pain, but did not believe the retained bullets were causing most of the pain. (R. 494.) Rather, Dr. Kapur attributed the pain to muscle spasms. (*Id.*) He recommended alternating heat and ice, home exercises and stretches, and physical therapy once Claimant was signed up for health care benefits. (*Id.*)

Claimant presented to the emergency room in August 2014, again complaining of back pain. (R. 471-78.) Imaging results were unremarkable other than the presence of the retained bullets. (*Id.*) Claimant followed up with Dr. Deepak Leekha a few weeks later. (R. 452.) A physical examination revealed tenderness of the lower back and he

---

[2] The record includes a March 2010 report from consulting psychiatrist Dr. Edmond Yomtoob from Claimant's prior disability application. (R. 574-79.) Dr. Yomtoob diagnosed Claimant with depressive disorder and polysubstance abuse disorder. (R. 576.) Dr. Yomtoob opined that claimant had mild difficulties in his ability to make judgments on complex work-related decisions. (R. 577.) Otherwise, the doctor noted no further limitations. (*Id.*)

3

was prescribed pain medication. (R. 453.) Claimant was treated in the emergency room in late 2014 for abdominal pain. (R. 620-65.) He underwent an initial physical therapy evaluation in February 2015 for his back and shoulder pain. (R. 682-87.)

**C. Claimant's Testimony**

At the time of the hearing, Claimant was thirty-eight years old and living with his mother and children. (R. 41, 43.) He stopped working after the shooting in 2005. (R. 46.) Claimant reported constant pain in his back, shoulder, and left toes, as well as problems with depression. (R. 47-48, 64.) He also reported that he suffered from paranoia, compulsive hand washing, and nightmares since the shooting. (R. 64-67.)

Claimant testified that he can sit for thirty minutes before needing to stand up. (R. 51.) He can walk five to ten minutes, with or without a cane, before needing to rest, and estimated that he could lift about twenty pounds a dozen times in a work day. (R. 50–51, 70.) To help his pain, Claimant sits and soaks in the tub multiple times a day. (R. 54, 66.) He stopped taking pain medication because it made him "feel bad." (R. 47.) Although his cane was not prescribed, he explained that he uses it for support every time he leaves the house. (R. 50, 60.)

As far as daily activities, Claimant does little. He occasionally cooks, but does not do any household chores. (R. 54.) He does take his kids to and from school and grocery shops about three times a month. (*Id*.)

**D. Medical Expert's Testimony**

Medical Expert ("ME") Dr. Hugh Savage, an internist, testified at Claimant's hearing before the ALJ. (R. 71-79.) The ME opined that Claimant suffered from myofascial pain related to a gunshot wound to the back foot and shoulder, chronic pain

4

syndrome, and polysubstance abuse disorder. (R. 74-75.) The ME testified that in light of Claimant's range of motion, it is unlikely that the lodged bullet fragments cause more than minimal pain. (R. 78-79.) According to the ME, Claimant did not meet or equal a listing. (R. 75.)

In the ME's opinion, Claimant would be limited to medium work; carrying 20 pounds frequently and 50 pounds occasionally, and could sit or stand up to six hours with normal breaks. (R. 75-76.) Based on his review of the record, the ME did not feel that a cane was required. (R. 76.) The ME testified further that Claimant would be limited to lifting five pounds overhead with the left arm and limited to only frequent pedaling activity with his left foot due to his gunshot wounds. (R. 76-77.) Claimant should also avoid concentrated exposure to unprotected heights and moving mechanical parts. (R. 77.)

### E. Vocational Expert Testimony

Vocational Expert ("VE") Lisa Gagliano also testified at the hearing. (R. 79-93.) She first described Claimant's past relevant work as a cabinet maker and framer as semi-skilled and medium under the DOT, but heavy as performed by Claimant. (R. 80.)

The ALJ then asked the VE to consider an individual matching the Claimant's vocational profile, who was limited to light work, with additional limitations, and who should not have a job requiring tight time deadlines or strict production quotas. (R. 82.) The VE testified that such an individual could work as a sorter (41,000 jobs nationally, approximately 1,800 in Illinois), hand filling and closing machine tender (52,000 jobs nationally, 950 in Illinois), and inspector/packer (83,000 nationally, 3,800 in Illinois). (R. 82-83.)

5

Upon questioning by Claimant's representative, the VE was asked to clarify her understanding of strict quotas. In the VE's opinion, "quotas refer to a specific number that an employee must finish by the end of the workday," which she differentiates from the general production expectations in every job. (R. 86.) For example, the VE explained that in a sorter position, an individual may get a bin of items to go through and sort, but would not have to meet specific timelines or deadlines to go through the bin.[3] (*Id.*)

Claimant's counsel also asked the VE how she calculated the available job numbers. (R. 90.) The VE explained she uses a methodology that incorporates data from the Bureau of Labor's Occupational Employment Statistics ("OES") and the Census Bureau's County Business Patterns "to deduct and come up with a reasonable conclusion as to how many jobs there are in the region and the United States." (R. 90-91.) When asked to clarify, she explained that she starts with the Dictionary of Occupational Titles ("DOT") to determine what percentage of DOT codes under specific Standard Occupational Classification ("SCO") groups are at a certain skill and exertional level. (R. 91.) She then erodes OES data based on that percentage and incorporates "County Business Patterns data if [she] need[s] to." (*Id.*) She also testified that if there is a job in the DOT that is "really outmoded," she will eliminate that job from her methodology. (R. 91-92.)

---

[3] Claimant's representative continued to press the VE on the distinction between strict quotas and general production expectations. The ALJ ended the questioning explaining that he found the VE's answer acceptable. (R. 89-90.) Claimant's representative then asked the VE "[w]here are some of these [sorter] jobs" and to name some companies. (R. 90.) Once again, the VE stopped the questioning explaining that the VE did not have to answer because all she is "required to do is say that in the region or in the nation there is an approximate number of jobs that she's using." (*Id.*)

Claimant's counsel then characterized the VE's methodology as "a total guess." (R. 91.) When he asked how many jobs might be available in the Chicago Metropolitan area, the ALJ told the VE she need not answer the question and the hearing adjourned. (R. 93.)

## II. Analysis

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to

7

trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis under the Social Security Act

In order to qualify for SSI or DIB, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

Here, the ALJ applied the five-step process to reach his decision denying Claimant's application for benefits. At step one, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of July 21, 2010. (R. 13.) At step two, the ALJ determined that Claimant had the severe impairments of affective disorder, status post multiple gunshot wounds resulting in soft tissue injuries

and pain, status post left toe fracture, and gastrointestinal disorder. (*Id*.) The ALJ found Claimant's PTSD and substance abuse to be non-severe. (R. 14.) At step three, the ALJ concluded that Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Commissioner's listed impairments. (R. 14-16.)

The ALJ went on to assess Claimant's residual functional capacity ("RFC"), ultimately finding that Claimant has the RFC to perform light work, with some additional physical limitations. Additionally, the ALJ opined that Claimant would be limited to understanding, remembering, and carrying out short and simple instructions, but would be able to maintain attention and concentration for extended periods as necessary to perform that work. Claimant could interact appropriately with supervisors and co-workers but should not engage in tandem projects or work tasks. The ALJ also found that Claimant would be unable to work in a position with tight deadlines or strict production quotas. (R. 16.)

Next, at step four, the ALJ determined that, based on the above RFC, Claimant could not perform his past work. (R. 22.) Finally, at step five, the ALJ determined that Claimant could perform work in other positions, including sorter, can filling and closing machine tender, and inspector/packer. (R. 23.)

Claimant now argues that the ALJ's decision is not supported by substantial evidence because (1) he erred in his assessment of Dr. Amdur's opinion; and (2) his step five finding was improperly based on the testimony of the VE. We address each argument in turn below.

### C. The ALJ Properly Assessed the Opinion of Dr. Amdur.

According to Claimant, the ALJ did not give good reasons for discounting Dr. Amdur's opinion. Again, Claimant saw Dr. Amdur at the request of his attorney. Among other things, Dr. Amdur assessed post-traumatic stress disorder with obsessive-compulsive symptoms, depressed mood and chronic pain. Dr. Amdur opined that Claimant's pain and intrusive thoughts would disrupt his attention span and leave him unable to tolerate work stress. The ALJ reviewed this opinion at step three and again when assessing Claimant's RFC, ultimately deciding to give it "little weight." In doing so, the ALJ reasoned that the opinion was based on a "one-time examination" that "relied heavily on [Claimant's] self-reports", which the ALJ noted he found only partially credible. (R. 21.) The Court finds no reversible error in this finding.

As the Commissioner argues, a medical opinion is only entitled to controlling weight when it is (1) rendered by a treating source, (2) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (3) not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c).[4] The ALJ need not consider a source to be a treating source if the claimant's relationship with the source is based solely on the need to obtain a report to support the claim for disability. 20 C.F.R. § 404.1527(a). As a general matter, regardless of the source, the ALJ must determine the appropriate weight to assign a medical opinion by considering relevant factors, including the nature of the treating relationship, whether the opinion was supported by evidence, and its consistency with other record evidence. 20 C.F.R. § 404.1527(c).

Here, the ALJ's decision to assign Dr. Amdur's opinion little weight is supported

---

[4] Though the Social Security Administration has recently modified the treating physician rule, it still applies to this claim, which was filed before March 27, 2017. *See* 20 C.F.R. § 404.1527c; *Kaminski v. Berryhill*, 894 F.3d 870, 874, n.1 (7th Cir. 2018), amended on reh'g (Aug. 30, 2018).

by substantial evidence. First, in reviewing Dr. Amdur's opinion, the ALJ properly pointed out that Claimant only saw Dr. Amdur on one occasion at the request of his attorney. The regulations explicitly permit the ALJ to consider the length and nature of the treatment relationship. See 20 C.F.R. §404.1527(c); see also Simila v. Astrue, 573 F.3d 503, 514-15 (7th Cir. 2009) (affirming ALJ's decision to discount the report of a one-time examiner hired by Claimant's attorney).

What is more, the ALJ provided other sufficient reasons for discounting Dr. Amdur's opinion. As stated above, in addition to considering the length and nature of the treatment relationship, the ALJ also discounted the opinion because it relied on Claimant's self-reports which were also provided while under the influence. Where, as here, the ALJ otherwise took issue with Claimant's credibility (and where Claimant has not attacked that finding), the ALJ's reasoning is sound. See Gully v. Colvin, 593 F. App'x 558, 564 (7th Cir. 2014) (noting that the ALJ logically assigned little weight to a medical opinion that relied heavily on claimant's subjective complaints, given the ALJ had found claimant not credible.) Throughout his opinion, the ALJ also pointed out a lack of treatment for mental health related issues or complaints of such issues in other treating records, and he also reviewed the mental health related findings of consulting physician Dr. Yomtoob from a prior application.

Lastly, to the extent that Claimant is taking issue with the ALJ's decision not to find PTSD (as diagnosed by Dr. Amdur) to be a severe impairment at step 2, that argument falls short. Having found other severe impairments at step 2, the ALJ proceeded with the analysis and properly considered both Claimant's severe and non-

severe impairments when fashioning the RFC.  For all of these reasons, the ALJ's treatment of Dr. Amdur's opinion is supported by substantial evidence.[5]

### D.  Remand is Required for Further Consideration of the Step Five Finding.

Claimant also argues that the ALJ's step five finding is not supported by substantial evidence.  Specifically, Claimant takes issue with the VE's methodology, or rather lack thereof, in calculating the number of jobs available to Claimant in the contemplated positions.

It is undisputed that the Commissioner bears the burden at step five. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).  This means that the Commissioner is responsible for establishing that there are a significant number of jobs that the claimant is capable of performing.  See 20 C.F.R. § 404.1560(c)(2); *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004) ("It is the Commissioner's burden at Step 5 to establish the existence of a significant number of jobs that the claimant can perform.").  To satisfy this burden, the Commissioner typically relies on vocational experts.  20 C.F.R. § 404.1566(e); *Liskowitz v. Astrue*, 559 F.3d 736, 742-43 (7th Cir. 2009).  A vocational expert's testimony, however, can only satisfy the Commissioner's burden if the testimony is reliable*.  Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008); *Allensworth v. Colvin*, 814 F.3d 831, 835 (7th Cir. 2016).  Although establishing the reliability of the job number estimate "does not require meeting an overly exacting

---

[5] In the same section, Claimant briefly argues that the ALJ erred in relying on the testimony of the ME because the ME testified Claimant could perform medium work, but the ALJ concluded he could perform only light work.  But "[t]he determination of a claimant's RFC is a matter for the ALJ alone…" *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014).  Where the RFC is otherwise supported by the record, there is no reversible error in this regard.

standard," it does require the Commissioner to "ensure the approximation is the product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 968-69 (7th Cir. 2018).

As at the hearing (and in his post-hearing brief), Claimant continues to take issue with the methodology used by the VE to calculate the number of jobs available that Claimant can perform. Based on the transcript from the hearing, it appears that the VE *may* have applied the equal distribution method, then *may* have further considered county business pattern data, and then *may* have eliminated "outmoded jobs" to calculate her numbers. Though the Commissioner seems to argue that the VE's methodology is sound and passes muster under recent Seventh Circuit precedent, the Court does not agree. *See generally, Chavez*, 895 F.3d 962. On the contrary, the Court simply cannot determine exactly what methodology the VE used from the limited explanation offered by the VE at the hearing.

Further, despite Claimant's counsel having objected to the VE's methodology at the hearing, the ALJ made no specific mention or findings as to the VE's methodology in his opinion. Instead, at step five, the ALJ simply cited to the VE's testimony and, without further explanation or ruling on any objection, generically stated that it was consistent with the DOT. It is worth noting that, in doing so, the ALJ violated the SSA's own guidance. *See Hearings, Appeals, and Litigation Law Manual* ("HALLEX") § I-2-6-74(B), *available at* https://www.ssa.gov/OP_Home/hallex/I-02/I-2-6-74.html ("At the hearing…, the ALJ must (on the record): … [r]ule on any objection(s). The ALJ may address the objections(s) on the record during the hearing, in narrative form as a separate exhibit, or in the body of his or her decision.").

All of this is not to say that the VE's methodology was in fact improper or unreliable; only that, on this record, substantial evidence does not support the ALJ's reliance on the VE's testimony. As such, further step five proceedings are required to determine whether the methodology relied upon by the VE to estimate the number of available jobs is reliable. The Court will also permit further questioning regarding the VE's understanding of strict quotas, and why, in her opinion, they are not required in the types of representative jobs provided.[6]

## III. Conclusion

For the foregoing reasons, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

**DATED: December 14, 2018**

_____
**Michael T. Mason**
**United States Magistrate Judge**

---

[6] However, the VE need not provide names of specific companies at which non-quota based manufacturing jobs are available.